FILED

DEC 1 8 2018

CLERK U S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.O. By and Through His Guardian Ad Litem SONYA WALKER,<br><br>                                    Plaintiff,<br><br>v.<br><br>ESCONDIDO UNION SCHOOL DISTRICT,<br><br>                                    Defendants. | Case No.: 3:17-cv-2400-BEN-MDD<br><br>**ORDER:**<br>**(1) GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. 18]; and**<br>**(2) DENYING PLAINTIFF'S MOTION TO SEAL [Doc. 20].** |

Pursuant to 20 U.S.C. § 1415(i)(2)(A), Plaintiff D.O. (a minor), by and through his guardian ad litem, Sonya Walker, appeals the Administrative Law Judge's decision after a three day due process hearing regarding D.O.'s Individual with Disabilities Education Act ("IDEA") complaint. Plaintiff D.O. now moves for summary judgment to reverse the ALJ's decision on two issues (Issue 2 and 3(b)) and to remand to the California Office of Administrative Hearings. [Doc. 18.]

Specifically, D.O. contends the Escondido Union School District ("District") violated the IDEA in two ways. First, D.O. contends the District denied him a "free and appropriate education" (a "FAPE") by failing to document the reasons it decided not to develop an interim behavior intervention plan, as required by California Education Code § 56521.1 (Issue 2). The Court disagrees, finding the District's mere procedural violation –

1

a failure to document the reasons for its decision – did not rise to the level of a denial of a FAPE to D.O. Thus, the Court affirms the ALJ. Second, D.O. alleges the District denied him a FAPE by failing to timely assess him for autism, waiting four months to begin the assessment process after being put on notice of D.O.'s suspected autism disability (Issue 3(b)). On this issue, the Court agrees and finds the District's four-month delay was a procedural violation amounting to a denial of a FAPE to D.O. Therefore, as discussed more fully below, the motion is **GRANTED IN PART AND DENIED IN PART**, and the action is **REMANDED** to the California Office of Administrative Hearings.[1]

---

[1] D.O. additionally moves to file under seal the administrative record for the underlying due process hearing before the Office of Administrative Hearings. [Doc. 20.] In support, D.O. contends the entire administrative record should be sealed based on the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. FERPA prohibits federal funding of an education institution that "has a policy or practice of releasing, or providing access to, any personally identifiable information in education records" without the written consent of the student, a lawfully issued subpoena, or a judicial order. *Id.* at § 1232g(b)(2). The term "personally identifiable information" means information such as names, birthdates, social security numbers, and "[o]ther information that, alone or in combination is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty." 34 C.F.R. § 99.3

D.O.'s motion to seal is overbroad because he seeks to seal far more than merely personally identifiable information. Further, D.O. does not cite any authority indicating that FERPA, in and of itself, establishes compelling reasons for sealing judicial records. Accordingly, D.O.'s motion to seal, Doc. 21, is **DENIED WITHOUT PREJUDICE**. To the extent D.O. still contends certain materials filed in connection with his motion for summary judgment should remain under seal, he must file a motion within seven days of the date of this Order narrowing his sealing requests and articulating compelling reasons to support sealing. To determine how to narrow his sealing request, D.O. should note that none of the information specifically referenced in this Order or the parties' briefing is sealable under the compelling reasons standard. *See also Karasek v. Regents of the Univ. of California*, 2016 WL 4036104, n. 8, at *17 (N.D. Cal. July 28, 2016) (holding same).

2

# I.  GLOSSARY OF TERMS

Because the IDEA is replete with acronyms that are often difficult to follow, a glossary of terms relevant to this Order is included here:

- **BER** – a "behavior emergency report," used to document the events surrounding a child's behavior emergency, including the staff's physical restraint of a child.
- **ERMHS** – "educationally related mental health services assessment," conducted by a school psychologist to further examine a child's social, emotional, and behavioral functioning.
- **FAPE** – a "free and appropriate education," guaranteed to all students by the IDEA, regardless of disability.
- **FBA** – "Functional Behavior Assessment," an assessment to determine the purpose or reason for behaviors displayed by a child with severe cognitive or communication disabilities for the purpose of identifying any new interventions that may assist the child.
- **IBI** – "Intensive Behavior Intervention program," a program at D.O.'s school, Miller Elementary School, consisting of two classrooms that each have a special education teacher and two instructional assistants to help support students academically and behaviorally.
- **IEP** – "Individualized Education Program," a written statement prepared by the professionals who assessed the student and includes: (1) the child's present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) a description of how the child's progress will be measured; (4) a statement of the special education and related services to be provided to the child; (5) an explanation of the extent to which the child will not participate with nondisabled children; (6) necessary testing accommodations; (7) the start date for the IEP; and (8) postsecondary school goals and transition plans for further education or employment. The child's IEP team may reevaluate and revise the IEP as new disabilities or interventions are identified.
- **Interim BIP** – "Interim Behavior Intervention Plan," a plan developed to identify intervention strategies to address a child's problem behavior and which may be based upon the results of a functional behavior assessment ("FBA").
- **OAH** – Office of Administrative Hearings, the state body from which appeals to a federal district court may be made. The California OAH is the state body that conducted the underlying due process hearing on D.O.'s IDEA complaint.

# II.  THE IDEA & THE IEP PROCESS

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and

3

3:17-cv-2400-BEN-MDD

1   related services designed to meet their unique needs" and "to ensure that the rights of
2   children with disabilities and parents of such children are protected." 20 U.S.C. §
3   1400(d)(1)(A) and (B). Before the IDEA's enactment, children with special needs did not
4   receive appropriate educational services, were often excluded entirely from schools, were
5   left undiagnosed, and did not have access to sufficient resources. *Id.* § 1400(c)(2). To
6   those ends, the IDEA provides states with special-education funding conditioned upon
7   creating rules, regulations, and policies that conform to the purposes and requirements of
8   the federal statute. *Id.* §§ 1407, 1411-13; *see also Honig v. Doe*, 484 U.S. 305, 310 (1988)
9   (describing structure of the Education of the Handicapped Act, the predecessor of the
10  IDEA). In California, those rules are found in the California Education Code §§ 56500, *et*
11  *seq.* and Title 5 of the California Code of Regulations §§ 3000, *et seq. Porter v. Bd. of Trs.*
12  *of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1066-67 (9th Cir. 2002).

13          States receiving funding under the IDEA are required to provide all disabled children
14  with a "free appropriate public education" ("FAPE"). *See* 20 U.S.C. § 1411(d). A FAPE
15  generally requires that every disabled child must receive an appropriate "special education"
16  along with "related services" "at public expense." *Id.* § 1401(9). Under the IDEA, a
17  "special education" means a "specially designed instruction" that "meet[s] the unique
18  needs of a child with a disability." *Id.* § 1401(29). "Related services" means transportation
19  to and from school and supportive services like speech-language pathology and social work
20  services. *Id.* § 1401(26)(A).

21          To ensure a FAPE, the IDEA requires that the local educational agency "conduct a
22  full and individual initial evaluation" of a student "before the initial provision of special
23  education and related services." 20 U.S.C. § 1414(a)(1). This evaluation "determine[s]
24  whether a child is a child with a disability" within the meaning of the IDEA, as well as "the
25  educational needs of such child." *Id.* at § 1414(a)(1)(C)(i), (ii). The local educational
26  agency must ensure, among other things, that the child is assessed in all areas of suspected
27  disability. *Id.* § 1414(b)(3)(B). After the requisite assessments are completed, a team of
28

4

1  qualified professionals must determine whether the child has a cognizable disability and,
2  if so, the educational needs of the child. *Id.* at § 1414(b)(4).

3        Once an initial evaluation report is issued, the professionals who assessed the
4  student, in connection with other qualified professionals and the student's parents, prepare
5  an individualized educational program ("IEP") for the student. *Id.* at § 1414(c), (d). The
6  IEP is a written statement that includes: (1) the child's present levels of academic
7  achievement and functional performance; (2) a statement of measurable annual goals; (3)
8  a description of how the child's progress will be measured; (4) a statement of the special
9  education and related services to be provided to the child; (5) an explanation of the extent
10 to which the child will not participate with nondisabled children; (6) necessary testing
11 accommodations; (7) the start date for the IEP; and (8) postsecondary school goals and
12 transition plans for further education or employment. *Id.* at § 1414(d). The team that
13 created the IEP then reviews it periodically and revises it as appropriate. *Id.* at §
14 1414(d)(4).

15                    **III.    FACTUAL BACKGROUND[2]**

16        D.O. is a ten-year old boy who qualifies for special education under the categories
17 of emotional disturbance and other health impairment. [AR 326.] Since kindergarten, D.O.
18 has attended the District's Intensive Behavior Intervention ("IBI") program at Miller
19 Elementary School. [AR 865:11-16; 938:13-23.] The IBI program consists of two
20 classrooms that each have a special education teacher and two instructional assistants to
21 help support students academically and behaviorally. [AR 920:20-921:2.] Students in the
22 program receive mental health services through Vista Hill, an agency providing on-site
23 mental health therapists, behavior rehabilitation specialists, and psychiatrists. [AR 860:3-
24 864:12; 921:2-22.] Throughout the day, the Vista Hill professionals support the students

27  [2] Escondido Union School District ("the District") requests judicial notice of the
28  California Office of Administrative Hearings' due process hearing decision. [Doc. 23.]
    The request is **GRANTED**. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 157 (1969).

5

1    in their classrooms and provide individual and group counseling. [*Id.*] The program
2    provides students with a high level of support and positive behavior interventions. [AR
3    759:12-20, 938:19-939:13, 1005:5-15-1006:17.]

4        From D.O.'s transfer into the IBI program in kindergarten until about February 2017,
5    he interacted almost daily with Rania Garva, his Vista Hill mental health therapist.[3]    [AR
6    865:12-866:25.] Ms. Garva provided D.O. with daily classroom support and weekly or bi-
7    weekly individual and group counseling. [AR 866:17-25.]    D.O. also saw Vista Hill
8    psychiatrists who Ms. Garva consulted with monthly. [AR 880:20-883:8, 884:19-885:17.]
9    Ms. Garva annually assessed D.O. by examining his mental health status, psychological
10   behaviors, emotional stability, family, school, academic performance, and medications.
11   [AR 867:2-868:5.]    As a licensed clinician, Ms. Garva also diagnosed D.O. [AR 868:6-
12   11, 872:7-10.]    D.O. was initially diagnosed with attention deficit hyperactive disorder
13   ("ADHD"). [AR 868:19-870:25.]    After observing D.O's increasingly elevated and
14   irritable mood, however, Ms. Garva diagnosed him with a mood disorder and then Bipolar
15   I disorder. [*Id.*]

16       In November 2015, the District conducted a triennial reassessment of D.O., the results
17   of which were reviewed at a November 18, 2015, individualized education program ("IEP")
18   meeting.    [AR 326-341.]    The District's school psychologist, Salvatore D'Amico, who
19   conducted the psychoeducational assessment, concluded that D.O's academic skills were at
20   grade level. [AR 341, 389.]    D.O. continued to qualify for special education under the
21   emotional disturbance and other health impairment eligibility categories. [*Id.*]    D.O.'s
22   mother consented to the IEP developed during the November 2015 meeting.    [AR 326-
23   341.]

24
25
26
27
28   [3] Ms. Garva is a licensed marriage and family therapist and clinician. [AR 872:7-
     12.]

6

## A. April 2016 Emergency Behavior Interventions

On April 8, 2016, D.O.'s behavior escalated, and he hit, kicked, and tried to bite staff. [AR 342.] Staff placed him in a two-person prone restraint for approximately twenty minutes. [*Id.*] Staff completed a behavior emergency report ("BER") documenting the incident. [AR 951:7-12.] On April 11, 2016, the District scheduled an IEP meeting on April 15, 2016 to discuss the incident. [AR 450, 436.] On April 13, 2016, D.O.'s behavior escalated again, requiring staff to use a two-person prone restraint for approximately thirty-five minutes. [AR 342.] Again, staff completed a BER documenting the incident. [*Id.*]

On April 15, 2016, the District held an IEP team meeting and discussed both the April 8th and April 13th incidents and determined that a functional behavior assessment ("FBA") should be conducted. [AR 342, 873:3-25, 876:11-13.] D.O.'s mother attended the IEP team meeting and consented to the FBA immediately after the meeting. [AR 342, 343-352.] At the meeting, the team also evaluated whether D.O. needed an interim behavior intervention plan by discussing what could be implemented or added to his IEP to help avoid his behaviors in the future. [AR 873:21-874:19, 877:21-878:8.] According to Ms. Garva, the IEP team determined an interim plan was not needed because numerous interventions were already in place, and the team needed time to collect data in order to determine which of those interventions were effective. [AR 874:15-875:5, 876:25-877:14, 900:6-20.] At the hearing, Program Specialist Tracy Lane stated three times that she could not recall specifically any discussion about an interim plan during the April 15, 2016 meeting.[4] [AR 463, ¶ 19.] However, Ms. Lane testified that it was her common practice to discuss the need for an interim plan during these types of meetings. [AR 932:24-933:5, 959:15-22.] Like Ms. Garva, Ms. Lane testified that D.O. did not need an interim plan at that time because they had seen an escalation of behaviors but no pattern, and they were still trying different interventions with D.O. [AR 954:21-955:21.] The IEP team's April

---

[4] Ms. Lane holds a Master's degree in School Psychology and holds credentials in School Psychology and Administrative Services. [AR 444-49.]

15, 2016 meeting notes did not include documentation of the reasons the IEP team decided not to develop an interim plan while the functional behavior assessment was being conducted. [AR 499, ¶ 24.]

### B. December 5, 2016 IEP Meeting and Autism Assessment

Because of D.O.'s escalating behavior in the Fall of 2016, Mr. D'Amico conducted an educationally related mental health services ("ERMHS") assessment to further examine D.O.'s social, emotional, and behavioral functioning. [AR 408-409, 735:1-15.] On December 5, 2016, the IEP team met to review the ERMHS assessment and another November 17, 2016 behavior incident. [AR 376.] Per the IEP notes, Dr. Dyson, a therapist who attended the meeting telephonically, reported she completed an assessment and, based on the assessment, D.O. appeared to meet criteria for autism spectrum disorder.[5] [Id.] In contrast, the IEP team recalled Dr. Dyson indicating that she was still in the process of conducting the assessment but believed that D.O. might meet criteria for autism spectrum disorder. [AR 728:23-729:11, 778:14-779:1, 786:21-787:5, 924:5-11, 925:3-9.] Despite attending the meeting, D.O.'s mother had no recollection regarding the information Dr. Dyson provided at the IEP meeting. [AR 699:15-22.]

Dr. Dyson, who began providing therapy to D.O. in July 2016, conducted an autism assessment of D.O. at the request of his mother. [AR 623:24-624:5.] As part of the District's ERMHS assessment, Dr. Dyson also provided information to the District regarding D.O.'s diagnoses, but she did not report any concerns about autism. [AR 401.] Rather, she reported that D.O. presented with unspecified psychosis and Disruptive Mood Dysregulation Disorder. [Id.] D.O.'s mother never asked the District to conduct an autism assessment. [AR 789:11-13.]

The IEP notes state Dr. Dyson was going to share the autism assessment report with D.O.'s mother who would then share the report with the IEP team. [AR 376.] D.O.'s

---

[5] Dr. Dyson is a licensed clinical psychologist at Rady Children's Hospital and provided ongoing therapy to D.O.

8

1  mother testified that, although she received the report and Dr. Dyson encouraged her to
2  share it with the IEP team, she never did. [AR 671:11-16.] When asked why, she testified,
3  "I'm not sure." [*Id.*] The District staff members attempted to obtain the report by asking
4  D.O.'s counsel for the report on April 7, 2017. [AR 26, 668:15-18, 985:13- 986:5, 992:5-
5  15.] The District did not receive Dr. Dyson's report until July 5, 2017, seven months after
6  the IEP meeting during which Dr. Dyson suggested D.O. might have autism. [AR 420-
7  28.]

8      Before performing its own autism assessment of D.O., the District wanted to review
9  Dr. Dyson's report both to determine if it was sufficient on its own and to identify the
10 specific tests she used because assessors cannot give certain tests more than once within a
11 year. [AR 778:23-779:1, 790:13-15, 924:20-925:2, 925:17-926:12, 969:22-970:10.]
12 Duplicating some tests within a specific time frame invalidates the results. [AR 924:20-
13 925:2, 925:17-926:12.] On April 7, 2017, after D.O. filed a due process complaint, the
14 District still had not received Dr. Dyson's report and went forward with providing an
15 autism assessment plan to D.O.'s mother. [AR 26, 41-42, 412-413.] Instead of signing
16 and consenting to the assessment plan, D.O. filed an amended due process complaint to
17 additionally allege the District denied him a FAPE by failing to timely assess him for
18 autism. [AR 53-63, 210:1-2, 689:15-17.] D.O.'s mother did not consent to the District's
19 autism assessment plan until more than four months later on August 23, 2017. [AR 689:15-
20 17.]

21      **C.  Procedural Background**

22      On March 28, 2017, D.O. filed a complaint for due process with the Office of
23 Administrative Hearings ("OAH"), alleging that the District denied him a FAPE in three
24 different ways. [AR 3-13.] On April 20, 2017, D.O. filed an amended complaint, asserting
25 the District additionally denied him a FAPE by failing to timely provide an autism
26 assessment. [AR 53-63.] On October 10, 2017, after a three-day hearing in August 2017,
27 ALJ Kara Hatfield found that D.O. failed to meet his burden of proof on any of his issues.
28 [AR 456, 458, 464, 502.] On November 29, 2017, D.O. filed his Complaint in this Court,

9

seeking reversal of the ALJ's judgment on all four issues (Issue 1, 2, 3a, and 3b).  [Doc. 1, p. 4.]  The parties jointly dismissed Issue 3a.  [Doc. 16.]  D.O. now moves for summary judgment on Issues 2 and 3b.  [Doc. 18.]

## IV.    ANALYSIS

D.O. moves for summary judgment on two grounds.  First, D.O. contends the ALJ erred in finding the District did not deny D.O. a FAPE by failing to document the reasons it refused to develop an interim behavior intervention plan, as required by California Education Code § 56521.1 (Issue 2).  Second, D.O. contends the ALJ erred in finding the District's failure to timely assess him for autism, after notification of the suspected disability, was not a denial of a FAPE (Issue 3(b)).

### A.    Standard of Review

"Judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly deferential standard of review." *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017).  Instead, courts "review whether a state has provided a FAPE de novo." *Id.* (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  A reviewing court may "accord some deference to the ALJ's factual findings, but only where they are thorough and careful." *Id.* (citing *Union Sch. Dist.*, 15 F.3d at 1524).  To determine whether an ALJ has been sufficiently "thorough and careful," it is not enough to focus on the "duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion." *Id.*  Rather, a district court judge "must actually examine the record to determine whether it supports the ALJ's opinion." *Id.* at 1194 n.1.

### B.    Discussion and Documentation of the Reasons For Not Developing an Interim Behavior Plan During the April 15, 2016 Emergency Behavior IEP Team Meeting (Issue 2)

On appeal, D.O. contends the ALJ erred by finding the District's failure to discuss and/or document its reasons for not developing an interim behavior plan did not amount to a denial of a FAPE.  Accordingly, this issue concerns the District's failure to comply with

a state regulation, California Education Code Section 56521.1(g), which requires that following an emergency intervention, school districts must hold an IEP team meeting:

> to review the emergency report, to determine the necessity for a functional behavioral assessment, and to determine the necessity for an *interim plan*. The IEP team shall *document* the reasons for not conducting the functional behavioral assessment, *not developing an interim plan*, or both.

Cal. Ed. Code. § 56521.1(g) (emphasis added). Here, D.O. contends that the District's failure to (1) discuss the necessity of an interim plan and (2) document its reasons for not developing an interim plan during the April 15, 2016 IEP team meeting, amounted to a denial of a FAPE. The Court considers each alleged failure in turn.

**1.    Discussion of Necessity for an Interim Plan**

The ALJ found the preponderance of the evidence established that, during the IEP team's April 15, 2016 meeting, the IEP team did discuss the necessity for an interim behavior intervention plan while the functional behavior assessment was being conducted. [AR 499, ¶ 22.] The Court agrees. D.O. fails to identify any facts in the record to support his conclusory claim that the District did *not* discuss whether an interim plan was necessary. [*See* Doc. 18, p. 24.] Nonetheless, the Court "consider[s] the [ALJ's] findings carefully." *Anchorage School Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012). As noted by the ALJ, Ms. Garva consistently testified that the IEP team discussed its decision about whether to develop an interim plan. [AR 487 at ¶ 23, 874:15-875:5, 878:3-8, 900:6-20.] Indeed, the IEP team specifically discussed what could be added to D.O.'s IEP and its determination that an interim plan was not needed because there were many interventions already in place, and the team required time to determine which interventions were effective. [*Id.*] Although Ms. Lane could not specifically recall the discussion, she testified that her common practice is to discuss the need for an interim behavior plan during these types of meetings. [AR 932:24-933:5, 959:15-22.] Like Ms. Garva, Ms. Lane testified that at the April 15, 2016 IEP meeting, she did not believe an interim behavior plan needed to be developed because they had seen an escalation of behaviors but had not yet seen a

11

1  pattern, and they were still trying out different interventions with D.O.  [AR 954:21-
2  955:21.]

3      Based on the Court's review of the record, the Court finds that the ALJ did not err
4  in concluding the preponderance of the evidence established the IEP team did discuss the
5  need for an interim behavior plan.  The Court agrees with the ALJ's finding that:

6      [w]hile the discussion seems to have occurred without formal announcement
7      that the discussion specifically was addressing the question of whether an
       interim behavior intervention plan was needed while the functional behavior
8      assessment the team recommended was being conducted, the substance of the
9      conversation was had; the team concluded an interim behavior intervention
       plan was not needed because District and Vista Hill personnel did not have
10     reliable information regarding the efficacy of the many interventions they
11     were in the process of trying with [D.O.] to manage his extreme but variable
       behaviors.

12

13  [AR 487, ¶ 23.]  Accordingly, the District did not deny a FAPE to D.O. by failing to
14  determine the necessity of an interim plan during the April 15, 2016 meeting because the
15  District *did* undergo the necessary evaluation of whether an interim plan was needed.

16      **2.    Documentation of the Reasons for Not Developing an Interim Plan**

17      Next, D.O. contends the District denied him a FAPE by neglecting to document the
18  reasons for its determination that an interim behavior plan was not needed while the
19  functional behavioral assessment was being conducted.  Thus, D.O.'s claim rests on the
20  District's procedural violation of Cal. Ed. Code. § 56521.1(g), which requires the IEP team
21  to not only have the discussion, but to "*document* the reasons for not conducting the
22  functional behavioral assessment, *not developing an interim plan*, or both."  Cal. Ed. Code.
23  § 56521.1(g) (emphasis added).  The parties do not dispute that the IEP team discussed the
24  need for a functional behavioral assessment and determined it was necessary.  Further, as
25  already addressed, the preponderance of the evidence shows the IEP team did discuss the
26  need for developing an interim plan and concluded it would not be helpful to D.O.
27  Accordingly, D.O.'s contention rests on the IEP team's failure to *document* in its April 15,
28  2016 meeting notes the reasons the IEP team decided not to develop an interim behavior

12

intervention plan while the functional behavior assessment was being conducted, violating the state regulation's § 56521.1. [AR 499, ¶ 24.]

"[A] state must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.,* 394 F.3d 634, 644 (9th Cir. 2005) (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206–07 (1982)). Compliance with the IDEA procedures is "essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001). "[A] school district must comply not only with federal statutory and regulatory procedures, but with state regulations as well: State standards that are not inconsistent with federal standards [under the IDEA] are also enforceable in federal court." *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cty., Mont.*, 541 F.3d 1202, 1208 (9th Cir. 2008). Still, "[n]ot every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE." *Amanda J.*, 267 F.3d at 892. "Technical deviations, for example, will not render an IEP invalid." *Id.* However, a procedural violation does result in the denial of a FAPE where the procedural inadequacy (1) results in the loss of education opportunity; (2) seriously infringes the parents' opportunity to participate in the IEP formulation process; or (3) causes a deprivation of educational benefits. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012).

There is no dispute that the District conducted a procedural violation by failing to document its decision as to the interim plan. Instead, the dispute centers on whether that procedural violation amounted to a denial of a FAPE. D.O. contends the District's failure to document its reasons for determining an interim plan was not needed, as required by state regulation, denied him a FAPE because it (1) significantly impeded D.O.'s mother's participation and/or (2) deprived D.O. of education benefit. The Court addresses each alleged basis for denial of a FAPE in turn.

### a. *Parental Participation*

D.O. contends the District's failure to document its reasons for determining an interim plan were not needed significantly impeded his mother's participation in the IEP formulation process, thereby denying him a FAPE. However, D.O. fails to support his argument with evidence from the record. The ALJ likewise concluded the District procedurally violated the state Education Code but did not deny D.O. a FAPE. The ALJ explained the basis for her findings:

> [D.O.] failed to demonstrate *how* the failure to document the reasons for the IEP team's determination significantly impeded Mother's opportunity to participate in the educational decision-making process. Mother attended the meeting and was present for the discussion regarding whether things could be changed or added to address [D.O.'s] behavior. She had the opportunity to request and provide information relating to whether [D.O.] would have an interim behavior plan.

[AR ¶¶ 24-25.] Rather than basing his argument on evidence in the record, D.O. instead relies on inapposite authorities and hypothetical policy arguments, which the Court rejects.

First, D.O. argues that upholding the ALJ's decision will "allow school districts to defy the legislature's mandate to document so long as the school district has some semblance of a discussion regarding an interim BIP." [Doc. 18, p. 18.] However, the ALJ found the IEP Team had far more than merely "some semblance of a discussion" regarding the interim plan. In contrast, the ALJ found that "[w]hile the discussion seems to have occurred without formal announcement that the discussion specifically addressing the question of whether an interim behavior intervention plan was needed . . . the substance of the conversation was had; the team concluded an interim behavior intervention plan was not needed because District and Vista Hill personnel did not have reliable information regarding the efficacy of the many interventions they were in the process of trying . . ." [AR 487, ¶ 23.] Regardless, the Court is not persuaded by D.O.'s argument because D.O. does not show how the District's violation of the state regulation requiring it to document seriously impeded his mother's ability to participate.

14

D.O. next cites several cases to show the importance of the IDEA's "formal, written notice requirement," but in so doing, he conflates the documentation requirement in § 56521.1 – the issue in this case – with the IDEA's requirement that districts make a formal written offer *of placement*. [Doc. 18, p. 18.] For example, D.O.'s citation to *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) is not persuasive because the issue in that case involved whether the district was required to make a formal *educational placement offer* under the IDEA, not whether the district denied a FAPE by failing to document its decision to not develop an interim BIP under the California Education Code. Likewise, in D.O.'s cited case, *Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1108 (C.D. Cal. 2000), the issue was whether the district's offer of multiple placement types, rather than one specific firm offer, was a procedural violation of the IDEA amounting to denial of a FAPE. Accordingly, the Court views these authorities as inapposite.

D.O. then cites a single OAH decision to show that the failure to provide clear written notice is "routinely found to be a denial of FAPE." [Doc. 18, p. 20 (citing *Student v. Fremont Unified Sch. Dist.*, OAH Case No. 2007090800 (2007)).] The *Fremont* OAH decision is likewise distinguishable, however, because it involved the district's failure to provide *prior written notice* of its refusal to conduct an occupational therapy ("OT") assessment requested by the parents. *Fremont*, p. 24, ¶ 114. That procedural violation is far more significant than the procedural violation at issue here – the District's failure to document the reasons for its decision not to develop an interim behavior plan, a decision discussed and made during the IEP Team meeting attended by D.O.'s mother.

In *Fremont*, the ALJ addressed the requirement that "a school district must provide prior written notice whenever it proposes or refuses to initiate or change, the identification, evaluation, or educational placement of a pupil, or the provision of a FAPE to a pupil." *Fremont*, p. 24, ¶ 111; *see also* 20 U.S.C. § 1415(b)(3), 34 C.F.R. § 300.503(a), Cal. Ed. Code. § 56500.4(a). The ALJ reasoned the lack of prior written notice was a procedural violation amounting to a denial of a FAPE because the failure "deprived Parents of the

15

1    ability to participate in the decision-making process regarding the provision of a FAPE to
2    Student in the area of OT." *Id.* Specifically, the ALJ reasoned the district's failure to
3    provide prior written notice regarding its refusal to conduct an OT assessment requested
4    by the parents, and its decision to instead conduct an informal OT observation and
5    consultation, deprived the parents of the ability to participate in the decision-making
6    process. *Id.* at ¶ 114.

7         In contrast to the facts in *Fremont*, D.O.'s mother attended the very meeting at which
8    the interim plan decision was made, had the opportunity to object to or discuss further that
9    decision, and consented to the District's decision during the same meeting to develop a
10   functional behavior assessment. Unlike the decision at issue in *Fremont*, the decision at
11   issue here did not involve the District denying a request made by D.O.'s mother without
12   any documentation, but rather, involved a determination the District was required to make
13   by virtue of a state regulation, a determination the District did make in the presence of
14   D.O.'s mother. Thus, the Court cannot say D.O.'s mother was "deprived . . . of the ability
15   to participate in the decision-making process" by virtue of the District neglecting to write
16   down the reasons for its decision as to the interim plan, particularly when the
17   preponderance of the evidence shows D.O.'s mother should have been aware of the reasons
18   because she attended the meeting where they were discussed. Regardless, *Fremont* is
19   inapposite because the present case does not raise the same prior written notice issue in
20   *Fremont*.[6]

21
22
23

24        [6] Further, even if the same reasoning and "prior written notice" requirement did
25   apply to D.O.'s case, *Fremont* undermines D.O.'s position. As to a separate prior written
     notice issue in that case, the ALJ found that because the IEP team discussed its reasons for
26   declining to grant the parents' request for a one-to-one aide during the meeting, the parents
27   were aware of the district's reasons, the district met its obligation to notify parents of its
     rejection, and the district was not required to provide additional notice and did not deprive
28   the student of a FAPE. *Id.* at ¶ 113.

16

Next, D.O. hypothesizes that because of the procedural violation, his mother did not have any opportunity to voice disagreement she "may" have had with the IEP team's determination, but again, his hypothetical arguments are not supported by the record. D.O. points to no testimony showing that his mother would have objected to the District's decision regarding the interim plan had the decision been documented, as required by state regulation. Further, D.O.'s mother knew the interim plan was an option because she attended the April 15, 2016 IEP team meeting where it was discussed. [AR 342, 587:6-20.] By virtue of her attendance at the meeting, she likely had an opportunity to actively participate in the discussion or to voice any disagreement she may have had with the team's determinations. Indeed, D.O.'s mother's agreement with the IEP team's determinations is suggested by virtue of the fact that she consented to the team's decision to conduct a functional behavior analysis on the same day of the meeting. [AR 342.]

D.O. next cites another OAH decision to argue that formal written offers are needed because parents are "not required to remember everything discussed" at an IEP meeting. [Doc. 18, p. 21 (citing *Student v. Sacramento City Unified Sch. Dist.*, OAH Case No. 2013060562 (2013).] The case's rationale does not apply here, however, because the *Sacramento* ALJ's comment concerned the district's obligation to provide documents translated in a parent's native language. *See Sacramento*, p. 30, ¶ 45 ("In cases where parents are non-English speaking individuals, if school districts could meet the requirement of ensuring their meaningful participation by only providing an interpreter at the meeting, the purpose of the law requiring translation of documents would be rendered meaningless."). Further, as discussed previously, the present case does not concern the District's failure to provide a formal written offer. Instead, it concerns the District's failure to document its interim behavior plan decision. Because D.O. did not show by a preponderance of the evidence that his mother's participation in the April 15, 2016 meeting was seriously infringed upon by the District's procedural violation, the ALJ correctly concluded that the District's procedural violation did not seriously impede D.O.'s mother's participation such that it amounted to denial of a FAPE.

### b.    Education Benefit

In the alternative, D.O. contends the District's procedural violation amounted to a denial of a FAPE because it denied him an education benefit. [Doc. 18, p. 24.] D.O. argues that had the District developed an interim behavior plan in April 2016, the District may not have had to physically restrain D.O. two additional times in May 2016. The Court rejects D.O.'s argument, not only because it is undeveloped in the record, but also because he raises it for the first time on appeal. *See, e.g., Baccei v. U.S.*, 632 F.3d 1140, 1149 (9th Cir. 2011) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal."). Furthermore, even if the Court were to consider D.O.'s contention, it is belied by the record. After the District developed an interim behavior intervention plan on June 3, 2016, D.O. continued to have behavior incidents that required physical restraint. [*Id.*] Accordingly, the Court cannot find the District's procedural violation denied D.O. an education benefit, amounting to a denial of a FAPE. D.O.'s motion for summary judgment is **DENIED** as to Issue 2.

### C.    Autism Assessment (Issue 3b)

D.O. contends the ALJ additionally erred by finding the District's four-month delay in assessing him for autism after Dr. Dyson disclosed his autism diagnosis denied D.O. a FAPE. Under the IDEA, the district must ensure that "the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B); Cal. Ed. Code § 56320(f). A disability is "suspected," and a child must be assessed, "when the district has notice that the child has displayed symptoms of that disability." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016). "Once either the school district or the parents suspect disability . . . a test must be performed so that parents can receive notification of and have the opportunity to contest conclusions regarding their child[]." *Id.* at 1120.

Here, the record shows that the District had sufficient notice of D.O.'s suspected autism, a conclusion neither party disputes. During the December 5, 2016 meeting, Dr. Dyson telephonically participated in the IEP team meeting held to review D.O.'s educationally related mental health services assessment. During the meeting, Dr. Dyson

18

stated that she had completed an assessment, that D.O. had autism spectrum disorder, and that she would give a report to D.O.'s mother to give to the District. Accordingly, the ALJ properly found Dr. Dyson's statements were enough to put the District on notice that D.O. was suspected of having autism, a disability not previously suspected. [AR 492, ¶ 47.]

D.O.'s mother did not give Dr. Dyson's autism assessment report to the District after the meeting. Meanwhile, the District did not begin the autism evaluation process until April 7, 2017, when it gave an autism assessment plan to D.O.'s mother. Thus, because the District did, in fact, begin to assess D.O. for autism, "[t]he question is whether [the] District's delay of approximately four months in beginning [that] process was a procedural violation of the IDEA." [*Id.*] The ALJ found that it was not and that, in the alternative, even if D.O. had proved a procedural violation, he failed to demonstrate how he was denied a FAPE. [AR 495, ¶ 56.] The Court disagrees and reverses the ALJ's judgment.

In concluding that the District's four month delay in beginning the autism assessment process was not a procedural violation, the ALJ relied on the following evidence. The District waited for Dr. Dyson's assessment report before proceeding with its own autism assessment in order to identify what tests Dr. Dyson used because duplicating some autism tests would render the results invalid. [AR 778:23-779:1, 790:13-15, 924:20-925:2, 925:17-926:12, 969:22-970:10.] On April 7, 2017, after the District still had not received Dr. Dyson's report, the District went forward and provided an assessment plan to D.O.'s mother to authorize the District to conduct its own autism assessment. [AR 26, 41-42, 412-413.] D.O.'s mother did not consent to the assessment plan until over four months later.

Although the Court finds the District was reasonable in waiting *some* period of time for Dr. Dyson's report before assessing D.O., a four-month wait equivalent to two quarters of a school year is not reasonable under these particular circumstances. Indeed, the evidence in the record reflects that the District's delay was due, at least in part, to the skepticism of its staff. At the hearing, District staff testified to their disagreement with Dr. Dyson's autism diagnosis based on their own day-to-day observations of D.O.'s behavior.

However, as the Ninth Circuit has clearly mandated, the District was obligated to assess D.O. for autism, *regardless* of the subjective views of its staff members concerning the likely outcome of such an assessment. *See Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016) ("School districts cannot circumvent th[eir] responsibility [to assess children in all areas of a suspected disability] by way of informal observations, nor can the subjective opinion of a staff member dispel such reported suspicion."). Moreover, the District's arguments that D.O.'s mother failed to offer the report to the District and waited approximately four months to consent to the assessment, herself, are unavailing; the onus is on the District, not the parent, to assess children in all areas of a suspected disability. Finally, the District's minimal attempts to obtain the report do not somehow justify a four-month delay, particularly when one of those attempts was made only after D.O. filed his due process complaint.[7] Thus, the Court reverses the ALJ and finds the four-month delay was unreasonable under the circumstances, constituting a procedural violation. *See also* Cal. Ed. Code § 56043(a) (requiring that an assessment plan shall be developed within 15 calendar days of referral for assessment).

Because the Court finds the District's delay amounted to a procedural violation, the Court next considers whether that violation resulted in denying a FAPE to D.O. Contrary to the ALJ, the Court finds it did. As discussed previously, a procedural violation results in the denial of a FAPE only where the procedural inadequacy (1) results in the loss of education opportunity; (2) seriously infringes the parents' opportunity to participate in the IEP formulation process; or (3) causes a deprivation of educational benefits. *Anchorage*

---

[7] The District responds by arguing that D.O. did not raise any issue in his initial complaint regarding an autism assessment and did not assert the autism assessment as an additional issue until *after* the District provided the assessment to D.O.'s mother on April 7, 2017. [AR 3-13, 53-63, 210:1-2, 689:15-17]. The Court is not persuaded by the District's defense. Indeed, the timing suggests that it was D.O.'s complaint that spurred the District into action, leading the District to propose an autism assessment after dragging its heels for four months.

*Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012). The ALJ incorrectly found D.O. did not establish a denial of a FAPE because he did not show by a preponderance of the evidence that the delay (1) denied him an educational benefit or (2) seriously impeded his mother's ability to participate in the decision-making process. [AR 495 at ¶ 56.]

The Court reverses on the basis of the educational benefit ground. As to that ground, the ALJ found D.O. failed to offer evidence that he was actually on the autism spectrum or that he would have received different goals, services, or placement had the District offered to assess him sooner. This finding was error. "[T]o succeed on a claim that a child was denied a free appropriate public education because of a procedural error, the individual need *not* definitively show that his educational placement would have been different without the error." *Timothy O.*, 822 F.3d at 1124. In fact, the Ninth Circuit has held that "[o]n more than one occasion . . . the failure to obtain critical and statutorily mandated medical information about an autistic child and about his particular educational needs renders the accomplishment of the IDEA's goals—and the achievement of a FAPE— *impossible*." *Id.* at 1126 (emphasis in original). Here, as in *Timothy O.*, D.O.'s IEP goals were likely inappropriate because they were made without sufficient evaluative information about his individual capabilities as a potentially autistic child. *See id.* Accordingly, because the District waited approximately four months to begin the process of obtaining information that might reflect an autism diagnosis and D.O.'s resulting differing needs, it was "impossible" for the District to provide a FAPE to D.O. *See id.*

For the previous reasons, the Court reverses the ALJ on Issue 3(b) and finds the District's delay in offering an autism assessment constituted a procedural violation of the IDEA and denied a FAPE to D.O. Accordingly, as to Issue 3(b), D.O.'s motion for summary judgment is **GRANTED**, the ALJ's findings are reversed, and the action is **REMANDED** to the California Office of Administrative Hearings.

## V.    CONCLUSION

D.O.'s motion for summary judgment, [Doc. 18], is **GRANTED IN PART**, and the action is **REMANDED** to the California Office of Administrative Hearings. Specifically,

21

1    summary judgment is **DENIED** on the less significant issue of 2 and **GRANTED** in D.O.'s

2    favor on the substantial issue of 3(b).

3

4    **IT IS SO ORDERED.**

5    Date: December ___, 2018

         HON. ROGER T. BENITEZ
6                                                          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    22